I'd like the clerk to call the first case, please. 16-2314 United Conveyor Corp. v. Travelers Indemnity Co. Okay, counsel, if you could all come up and introduce yourselves, and then go back to where you belong if you're not going to be arguing. Barry Lunderstand from Congener and Plotkin on behalf of the propeller. Donna Vobornik from Dentons on behalf of the Travelers Companies. Thank you. All right. Thank you. Thank you. May I ask what the court anticipates in terms of the timing for the argument so I can engage? I would like to save some time for rebuttal. I'm sorry, sir? I'm asking what the court contemplates in terms of the timing. Well, we have another case following this, and generally we give everybody, the whole case, 30 minutes. Let's try and keep close to that, if you don't mind, and let us know if you plan to reserve some time. Yes, I would like to save four minutes or so for rebuttal. Okay. Okay? Thank you. All right. May it please the court. My client, United Conveyor Corporation, or UCC, as I'll refer to it, is a family-owned engineering business, as it was described by the circuit court. Well, it's more than that, isn't it? I mean, they manufactured and they distributed as well, and you've admitted that. Well, they... You've admitted that, correct? Yeah, well, if you're talking about the interrogatories, it's a little more complicated than that. But they manufactured as well as designed? It's our understanding that at the very least you manufactured some parts of these huge assemblies and that you assembled some parts of these huge assemblies, and then I imagine what you packed them up on trucks and boxes and whatever. Yes, these are enormous systems that are designed to remove coal ash from the coal-burning power plants. And the United Conveyor designs these things and sells them, and it has designed them in the past, it did, to include certain asbestos-containing parts. These were small elements, small parts of the system, and it's important to note that UCC did not manufacture these products for independent or direct sale. In any respect, they were exclusively for use with the... Could you put together one of these systems at an electric power plant without using that cement stuff? Well, that's a subject that was open to some question. Let me start by saying the answer is absolutely yes, and we have since 1984 without any asbestos. Well, but before 1984, the cement stuff that's the problem here came in the same boxes, the same truckload of stuff from your company. There was testimony from Mr. Jacobs, who was a member of UCC's administration, that there were systems that did not use the asbestos, the bottom-ash coal systems. Some of them did not. He was not able to identify any specifically at the time of his deposition, but the fact of the matter is that he was talking in 2015 about projects that had been concluded obviously before 1983-84 because that's when the shift was made, so that's a long time. In addition... As far as the record shows, every system designed by UCC for use in a high-heat application included asbestos parts, whether it was the cement or the gaskets. Yeah, in the high-heat, yes, that's certainly true. Okay. And how much and in what form depended very much on the custom design... It doesn't matter, does it? For purposes of this case, why would it matter how much and what the design was? Why? Well, I think... What case are you relying on that says how much in the design is important? Well, I think the design factor is an important part of this because of the NICOR standard. The NICOR standard. Separate and intervening human acts. What was the human act? The human act was they manufactured, they all designed to have the asbestos, right? Were they all designed to have the asbestos? Yes or no. Yes or no. Were they all designed that we're talking about? That's an open question on the record. As I just said, and I don't mean to fight with you, Your Honor, all of the high-temperature ones certainly were. Well, that's what we're talking about, isn't it? Isn't that what we're talking about? Is that what we're talking about? Are we talking about the high-temperature ones? Yes, but the point is... Well, we're talking about the others and it doesn't matter. Except that, Your Honor, each one of these was custom designed. And the extent to which people were put at risk depended upon the custom design. The custom design related to the layout of the customer's plant, right? You could have a huge plant. You could have a small electric company. The design had to fit within the building that the customer had, and so it was custom. But if it was a high-heat application, whatever the dimensions of the building it was going into, it had asbestos-containing gaskets and it used NuvaSeal or some other asbestos-containing cement. Yes. Absolutely. I'm not fighting on that point. I do believe that the custom design is an important part of this, even though the custom design always, in those years, in those systems, entailed including asbestos. That was an engineering decision that was made each time they did one of these plants. That was the cause we're looking at, isn't it? The cause of these problems is asbestos. We're not looking at design wasn't the cause. It had to have asbestos as the cause. There would be no asbestos if they weren't designed. This is an engineering firm that does design. It does manufacture and does distribution. You can keep saying that, but let's say we don't buy your design theory, then where are you? All right. I'm still here talking because I'm going to distinguish the US gypsum for you anyway. I want to go back to the fact that Circuit Court recognized the fact that my client is not an industrial manufacturer of asbestos-containing building parts. In the asbestos litigation universe, it doesn't matter whether you're a mass manufacturer of an asbestos product, whether you just distributed it, whether you incorporated it into a product that you later sold. I mean, really, anything that asbestos touched, your client's going to be tagged, right? Absolutely. Well, absolutely from the standpoint of liability, but the question of how you define an occurrence when my company, an engineering firm, which went to travelers to ensure what it was doing, how you define that in that contractual context, I think it does make a difference because what we are doing is very different from what gypsum, for instance, was doing. Gypsum was cranking out asbestos plaster constantly. I don't want to say that's all it did. It had various different product lines, but that's what it did. What my company did, what my client did, was very different. It designed, I'm sorry, it did design these huge plants. In the course of designing these huge plants before 1983, it made an engineering decision that asbestos was the best property for certain uses in this product. Now, this was not a big part of the project, and they did not offer this for sale. They bought asbestos from a place for the first 10 years or so. They bought asbestos, they bought plaster, and they passed them along to the people who were doing the installation. They didn't even know. But really what's important here is the policy, and if you look at the language in the policy, travelers, and you look at the language in the gypsum, it's just about identical. Yes, the language is the same. It's very similar, and we're not distinguishing this on the basis of the language. Well, then why would there be a difference? Because what this Court said in gypsum was that the continuing process of the manufacture and sale of asbestos-containing products, that's what gypsum did. That's what it did. That's not what we do. We took small amounts of this asbestos and incorporated it into these systems. But it doesn't matter. It doesn't matter if it's a small amount or a big amount. What matters is the use of the asbestos. Isn't that right? Well, I respectfully disagree. Well, does it matter about the use of the asbestos? When we're talking about defining the term occurrence, how many occurrences occur? Well, we're not at occurrence. We're talking about the cause. The case law talks about cause, right? That's what we're looking at, cause. That, to me, is the central issue in this case. Okay. We're also looking at occurrences. Well, cause defines occurrence. Again, I'm not fighting with you on that point. But this was not a steady outflow of asbestos product. This was a manufacturing process. I think this is a much closer case, really, to the Mason case or the Michigan chemical case that the Supreme Court reviewed in NICOR and approved, said, well, a restaurant serves multiple hamburgers topped with botulism-bearing onions. It's not the fact that they mix up this huge batch of botulism-bearing onions, although you might think so, but it is the fact of service. So from our perspective, nobody got hurt until we designed these products, and it would take years sometimes to design these systems, and then sent them out into the world for manufacturing one unit at a time. And so that is like the one hamburger at a time or the one bag of toxic animal feed in Michigan chemical case. Again, if you're not willing to look at my design, if you want to see the impact of these asbestos, asbestos went out not as a product for sale generally, but as a part and parcel of these systems which went out one at a time. Was it intrinsically harmful? Yes. Asbestos is asbestos. Yes, yes. It was part of the design-manufacturing distribution. Yes, but again, I think here, again, what we're talking about, and I want to bring this back to NICOR, if I may, where the NICOR standard is where each asserted loss is the result of a separate and intervening human act, whether negligent or intentional, or each act increased the insured's exposure to liability, no other law would deem each such loss to have arisen from a separate occurrence. And what I'm saying is it's with each system that went out that this asbestos went out. It wasn't being sold in a continuous process. And the continuous process is really the essence of the gypsum line. The Supreme Court in NICOR highlights the continuous nature of gypsums cranking out products. It likens it to the household manufacturing. It talks about selling product, inherently dangerous product, on a mass basis. And whether it was on a mass basis, UCC designed and sold ash conveyor systems containing asbestos for 50 years, right? Right. Well, again, what's at issue here is an engineering judgment to include asbestos in each of these systems. Isn't part of the problem with relying on NICOR the fact that 195 cases were distilled out of thousands of cases, but in those 195 cases, some guy, some person, some worker dropped the thing or moved it the wrong way or tilted it the wrong way. There was something that happened to the container that had the mercury that caused the mercury to spill. Here we're not talking about that. Here we're talking about, oh, I'm the owner of the utility company, and here comes the truck with my new system from UCC. Oh, and here's the box with nuts and bolts. And here's the box with the sealer. And here's the box with the cement. And here's the box with the gasket. And, okay, we're going to, and that guy is standing right here helping me put it together. We're all going to put it together. So no one's saying, oh, these events wouldn't have happened if everybody had, if somebody had done something wrong, because nobody did anything wrong. They put it together the way they were supposed to. And they maintained it the way they were supposed to. And they repaired them the way they were supposed to. And in my court, they didn't. Well, I understand the court's distinction. But the fact, you know, I go back to the engineering and the custom design. I'd like to point you to the village of Camp Point, which is another case involving the exercise of professional judgment. That's an attorney case. And there, the attorney for the village misunderstood the law, and he told the villagers to go ahead with several different bond issues, all of them based on the same piece of advice, based on the same misunderstanding of the law. And the court held, and again, NICOR affirmed, that this, each was an independent judgment. Each one, each bond issue, like each system that we sent out based on our engineering judgment to include asbestos, was a separate one. Well, why look at that case? We have the Gibson case, which is extremely close, if not pretty much identical to the situation we have here. Because I guess I keep coming back to my view that my client is the engineer. We don't accept that. As I started out, I said, you have to accept that as a premise to your argument, it seems to me. Tell me if I'm wrong. I'm trying to learn from you. I'm trying to persuade you at my level. But say you can't persuade me on that issue. Is there another hook? Well, the other hook was the Mason case. You know, setting aside the engineering design, okay, still what we are doing is not what Gibson is doing. We are not mass producing. The word mass isn't in Gibson. It's in NICOR. It's in NICOR. And the word continuous is in Gibson. And that's the key focal point word. And what I'm saying is we did not engage in the continuous Mason case. I think over four or five decades we must have done that. Well, it's bit by bit. But only out with the product. If I may, I'd like to turn to the denial of the motion for leave to amend. That's where we'd like to go. Yes. We would like that also. Okay. Let me ask you just before you launch into your argument. In 2009, your brief says UCC learned that for the first time, Travelers was taking the position that this was one occurrence. 2009. Are there any letters or e-mails or anything else in the records where UCC says to Travelers, Wait a second. Since the beginning of this whole fiasco, we've been under the impression that you've been treating these as individual occurrences. Now you say it's just one big occurrence. Is there anything in the record that says that? I do. I believe so. I'll have to check and get back to you when I get up for rebuttal. But I do believe there was considerable back and forth about this issue. And I know that beforehand we were in possession of loss run reports that they gave us regularly. And those loss run reports for the years, for virtually every year that was concerned where the single occurrence level was below the aggregate, they showed payout above the single occurrence level. Did they show that Travelers charged either a deductible or an SIR for each claim? To be honest with you, I'm not sure. I couldn't find it in the record. I did not see any. Okay. So when you come back, you'll tell us. Yeah. And also when you come back, I'd like to know a little bit more about the stipulation that's stated 925.14 that's in the separate appendix at your page, S.A. 87. But now we really need to get to the amended complaint. That's where I'm headed. And then, you know, there's an irony here, I guess, because Travelers went basically 26 years, a quarter of a century, without stating this position. And its reservation letters, which are definitely in the record, say just generically limitations in the contract. They don't make any reference to the … Well, they say that the reservation is subject to the appropriate limitations of liability. Is there any case that says an insurance company has to do more than that to invoke the policy? Well, I think Royal Insurance comes very close here on it. It talks about having to hit the nail on the head with your reservation letter so that your insured knows exactly what your position is and exactly what you're reserving. And so I think that's a sufficient basis for us to say, well, we're going to have to do a little more. We need to do a little more. And in a situation where for 20-some years they paid up above the limit and sent us the loss line report and didn't say anything to the contrary, I think that's a sufficient basis. Now, despite this long delay, they're trying to, you know, hand the court sort of whitewash a quarter century of not communicating this to us. And essentially because, you know, it took us two years to lay out the theory in full, which we did in the summary of the judge proposal. And I note that Travelers was allowed to conduct discovery after that summary judgment motion. But the argument you advanced in opposition to summary judgment was that Travelers had not reserved its rights. And Travelers conducted discovery on that. The reservation letters that had been sent to UCC over the quarter of a century were produced. And then in the reply, you said, oh, they reserved, but they didn't reserve well enough. Isn't that a different issue? I think it's all part of the same. I think it's all part of the same. The fact is that we laid out our argument in our opening summary judgment, which was the first summary judgment, about the waiver and the stock. And that was the first time it was fully articulated. I think if you look at the original complaint in paragraph 14, the last sentence there, talks about the fact that we believed, based on what Travelers conducted, that it took the same view of the contract that we did. So there was at least some seed of it, but obviously it was not developed as a settlement. But in your ruling in 2009, according to you, they didn't take the same view of the contract. Why didn't you include a claim in the complaint? There wasn't anything preventing you from doing that, was there? Well, there was nothing preventing us. I think we viewed that at the time as the facts as evidential for the strength of our argument on the merits of the policy, that they went along with our viewpoint for all that time, and then so demonstrating the reasonableness of the viewpoint that there were multiple occurrences in the issue. But under Loyola test, you weren't curing anything. You created a new cause of action, a new count in the complaint. We're talking about curing. That's much further than a cure. You know, respectfully, I disagree. I think Loyola's puts the clear, the standard is that the rules, like 2105G, require the trial court to permit amendment if it will further the ends of justice. And that's why I think, that's why I was starting out with the general facts. With respect to the cure issue, you can cure a complaint by fleshing out a claim that was not made in full or even in part. I mean, Loyola proves that because Loyola was a case with a complaint that involved a breach of merchantability. And Loyola permitted an amendment after summary judgment on that claim for breach of warranty of fitness for a particular purpose, for a breach of a sales contract, and even for a statutory Consumer Fraud Act claim. Hoover, the following year, again, also added a claim that was an undue influence case, you know, an estate case. And in Hoover, the Supreme Court reversed and said you should let the plaintiffs add a new count for fraud and inducement. So the Supreme Court, I think, does not limit the party to just patching up the claims that they're in. The point is that the goal is to get justice done. And here, justice would be done by letting the fact finder assess the significance and all the facts surrounding it. But the question is abuse of discretion. And that's pretty high standard for you to say that. We're to say the judge abused his discretion here when he considered all the factors and, you know, looked very closely and did a very thorough job in ruling on this case. Well, that's the conclusion the Supreme Court came to in both Loyola and Hoover. They were reversals for abuse of discretion. And the – Well, that's different here. I mean, here, way back in 2009, if not before, you had, as you just admitted, there was an inkling of what was going on in your complaint. So this is not something new. I mean, if we allowed this, if this was the norm, then we'd have summary judgments and then we'd have amended complaints and more summary judgments and another amended complaint. It would never end. The idea is that cases should be decided when everybody knows, unless the factors are not met in Loyola, you have your shot. Well, you know, this was not even a case that had been set for trial yet. I mean, it was still – It wasn't even set for trial. Well, that's irrelevant. Well, that's a standard that Hoover applied, for instance. Well, we're looking at Loyola here, so, you know. Well, as you know, Hoover adopted Loyola. I mean, it was just – it was the same standard. And it said – it reminded courts that when you look through the Loyola four factors, the primary significance is of doing justice, is being reasonable here. Well, but is it reasonable on the other side? We have to look at both sides. Well, you know, this – Is it fair to the other side to have waited all that time and all those years and then after you lose the summary judgment, then you spring it? Well, again, it was not – this was not sprung after we lost the summary judgment in the sense that we laid out the full claim in the summary judgment, which was only two years after the complaint was filed. But timing isn't a factor, though. Cases say that. Well, timing is one of the four. It's untimely, yeah, right. And it could be untimely because it was all spelled out before. Well, the suit was – the suit was timely filed. And what I'm saying is that the request for amendment, which came hard on the heels of the decision saying, well, you really need to plead this, not just have it in your summary judgment, you know, that was three weeks later. So that was very quick. And the fact is that Travelers got to do discovery after the summary judgment was filed before it had to respond. So there really is no prejudice here. I've been answering a lot of questions, and I think maybe I should – if I have any time left, I would like to reserve it for a short rebuttal. That would be fine. Thank you very much. Thank you. Good morning, Your Honors. This Court held in U.S. Gibson that where the cause of the asbestos injury was the continuing process of the manufacture and sale of asbestos-containing products, there was a single occurrence. For the very same reasons this Court reached that single occurrence decision in U.S. Gibson, this Court should affirm the trial court's finding of a single occurrence here. I'm going to jump to some of the distinctions that UCC has attempted to make, the differentiations from U.S. Gibson. UCC argues that a single occurrence was found in U.S. Gibson because U.S. Gibson was an industrial manufacturer or mass producer of asbestos products and that UCC is not an industrial manufacturer or mass producer. UCC offers no definition of what an industrial manufacturer or mass producer is, and if UCC is not an industrial manufacturer, I ask you, what are they? The record is – Well, how do you answer Mr. Levenstam's argument that all of these systems are individually designed and so it's the design of a particular system that is the cause of UCC's liability? It's not the design of the particular system at issue. The systems varied with respect to scope and geographic orientation related to the facility that they were going into, but the cause here, and it is the cause test, is the inclusion of the asbestos component in the products that they were putting into the market, and the utilization of the asbestos component was consistent throughout these systems. I think that what UCC is doing is playing a bit of a semantics game with the word design or engineer. It claims it designed or engineered systems attempting to downplay the fact that it manufactured and sold them, but UCC admits in the record that it designed, manufactured, and sold its ash hauling systems. At the end of the day, a customer of UCC didn't just get a set of plans. They bought and received a UCC ash conveyor component, parts of which UCC manufactured, and components of which included asbestos. The fact that the part of what UCC did include a design does not alter the predicate, and I think predicate is a word that we haven't heard yet here this morning, which is a very important word for this case, which is the predicate of why UCC is here today, which is that UCC systematically and continuously included asbestos in the products that it sold for decades. In particular, UCC supplied its proprietary branded asbestos-containing cement, NuvaSeal, with its ash hauling systems for 50 years. It produced and sold that cement systematically nationwide for 50 years as a component of its ash hauling systems. That's no different than U.S. Gypsum for purposes of this case. The amount of asbestos in the product, or the incidentalness, is also irrelevant to the occurrence analysis. Neither Gypsum nor Household, and that was the plumbing systems in Household, discussed whether asbestos was incidental in the products. UCC incorporated asbestos in its products in volumes sufficient to cause injury, and that's all that's relevant here. UCC's claim that not all of its ash hauling systems contained asbestos is likewise neither relevant nor supported by the record. As a factual matter, UCC's corporate representative could not say whether UCC ever actually produced and sold any ash hauling systems that did not contain asbestos. But more importantly, there is no suggestion in either Gypsum or Household that it matters whether the policyholder also sells additional products that do not incorporate asbestos. Obviously, liability did not attach in connection with the non-asbestos-containing products if they existed. All that matters for the occurrence analysis is the predicate for the insurance liability was the systemic and continuous production and sale of a product that did contain asbestos or was defective, which is what we have here. So what about UCC's argument that for 25 years, travelers provided loss runs that showed in the 1952 policy, which had a $100,000 per occurrence limit, it had paid out $110,000 or some such number, that the loss run showed that amounts exceeding the per occurrence limits were paid? Well, I think the important backdrop to that is for decades, even longer than they sent loss runs. They were sending the reservation of rights letters that you heard about earlier, which specifically indicated a reference to the limitations of liability, the limits of the policies applying. That's the first thing. But the second thing, if we're going to turn, you have to turn to the Loyola factors. And the point is that they had those loss runs before they filed their original complaint. When they filed the original complaint, they had both the reservation of rights letters and they had the loss runs. There was only a single piece of evidence. And they admitted in their original complaint that they knew travelers was taking a different view. It's one of the allegations of the very first complaint. So there's no mistake that they already had the information with respect to this alternate issue that they raised only after summary judgment. The initial complaint, though, formulated the question of by breach of contract and summary judgment, is it one occurrence or is it multiple occurrences? That was the original complaint. And that's what the judge ruled upon. The amendment that they are seeking here is a very different animal. It's a different issue. The amendment says, well, in essence it assumes, it's an alternative theory, that it is one occurrence. It says, well, if it is one occurrence, now the problem is that you didn't sufficiently reserve on that issue. That's a wholly different issue. That's a different claim. It's a claim that, in fact, concedes that it's one occurrence in essence because it takes as the premise the one occurrence thing and says, well, it's one occurrence, but here's the problem. You didn't properly tell us that. That's a different claim. The policies were essentially the same throughout all those years. The policies in your amendment. 1950 through to 19-whatever. Right. The policy was the same. The definition of occurrence was the same. Exactly true. And there's been no debate that there's, amongst the parties, that there's an impact with respect to any differing language. You asked about a stipulation, I think, earlier on. And let me address that just very briefly. We had lost policies in this case. It's a lengthy period of time, 1952 to 1975 or 79. Well, it was 52 to 61. There's a lengthy period of time, and there's only a couple policies that were actually located, the actual paper policies or the word. So what the policies did prior in connection, before the litigation even started, is they put together a stipulation. That's the stipulation, which adopts language that is comparable to the language that they located, and they put it in the stipulation. And it is the occurrence language that is, as Judge Hyman has recognized, is for purposes of this case not different than the language in U.S. Gibson. I have a question on the amendment. So the judge, after summary judgment, the judge says you can amend. And they file an amendment. Now, isn't it an abuse of discretion for the judge then to say, well, wait a minute. I said you could amend, but now you can't amend. Where is the equitableness there? I don't think he said you can amend. I think what he said is you may move to amend. And I think the Loyola was up to the amendment. He invited it. He invited it. He said, yes, if you want to have another claim, you're going to have to amend. Okay? That's in essence what he said. Well, they did. Well, they tried to, and then they were confronted. There was no suggestion that we wouldn't get to object to that amendment. And we did, and we asserted the Loyola factors. And with respect to the Loyola factors, as you know, in the first district there are four factors. In order to be permitted to amend, you have to, UCC would have to prevail with respect to all four of those factors. And I think if you're dead on one, you're dead on all. And I think that we have discussed here, and you've heard here this morning from my opponent, that they had all the information that they already needed for this. The time, we were four years in. Some of it they didn't have until the depositions. There was only one piece of it. There's actually three pieces of evidence that they are including in the factual allegations of their proposed amendment. The reservation of rights letters, those they had. The loss runs, those they had. And some internal e-mails of travelers. That's what came out during discovery. But that didn't change anything. All those internal e-mails showed is that there was some memos back and forth between travelers, individuals, about should we, what if we reallocate this? What, you know, what would it look like? It's that. But it's no different. It didn't change the view. Well, wait. It is different if you're saying, oh, it's going to be one thing. And then all of a sudden, no, it's going to be another thing. And that's, I think, what the e-mails were about. No, travelers had already told them in 2009. 2009. Travelers taking positions. Went across positions. Not that they switched, but that that was their position. In 2009, they told them that. It wasn't their position or what they were actually doing before 2009. So this pattern of practice before 2009, and then 2009, they say, oh, wait, wait a minute. Hold the fort. We're changing our mind. We're doing something. We're doing it differently. How would anybody have known they were going to do that? Well, first, there's another complicating factor here, which is that travelers provided the excess insurance right above the primary. Right. So travelers was going to be paying these claims regardless. Okay? Travelers had sent loss runs before 2009 that did show the primary limits and showed money paid above the one occurrence. That is true. There was no communication between the parties at that time, between the parties, about any issue about was it multiple or was it one. Okay? All they got was those loss runs. Then internally, travelers exchanged memos between themselves about if we allocate this, this is how it turns under the one occurrence. This is how it gets reallocated. There was no suggestion or statement or any piece of evidence ever that travelers said, we are taking a multiple occurrence position. They never took a position that they didn't take that position. So it can't be really deemed to be a change. The loss runs didn't show that they were taking that position? The loss runs just showed a number that exceeded the single occurrence limit. They're charts. They're numbers. And as a practical matter, because travelers was both the primary and excess, travelers was going to continue to pay no matter what. That's exactly correct, Your Honor. I can turn to the other Loyola factors if that would be helpful. At their essence, there's four factors, timeliness, prior opportunities to amend, prejudice to travelers, and whether the amendment seeks to merely correct a defective pleading or that is sort of conformant to the evidence or present a new issue. The fourth factor is the factor that I have been discussing, that this is not something that is just curing a defect. But the other factors here with respect to timeliness, this amendment came four years later. But it's more importantly, it was brought after summary judgment was entered against UCC. Even if UCC claims that it needed the materials produced in discovery to make its waiver in a sample allegations, those were available before UCC filed its summary judgment motion in August of 2014. There was no excuse for UCC's further delay. Likewise, UCC had ample opportunities to amend. There was nothing that kept UCC from amending at any time. In fact, there was a footnote in Traveler's First Summary Judgment Brief inviting it. It could have filed an amended complaint when it sought summary judgment, and there was no question it could have amended in March 2015 when Travelers raised the issue in the summary judgment briefing that UCC's complaint pled no facts related to waiver or estoppel. It is simply not the case that the first opportunity UCC had to amend was after Judge Valderrama granted Traveler's summary judgment. It's notable that in the original complaint, in Illinois as a fact pleading state, nowhere in that complaint is there a reference to a reservation of rights letter. Nowhere in that complaint is there a reference to a loss run. Nowhere in that complaint does it say reliance, estoppel, waiver. None of that. The first complaint does reference estoppel and waiver. No, it doesn't. The first complaint is about is it one occurrence or is it multiple occurrences? Could you talk about the stipulation that I asked counsel about, please? This is the stipulation that was entered into in August 25th of 2014. I'm just curious about the sentence. It says, for the purpose of determining the limit of Traveler's liability, all bodily injury and property damages arising out of conditions of repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence. What does that mean? I think what you're referring to is the DGSA 89, the white, the fat one, separate appendix. I just want to know what you think that sentence means. And I'm going to ask him the same question. This is the sort of, it's a language, it's clear on its face, in my opinion. It is that when you determine the limits, all the bodily injury arising out of continuous or repeated exposure to substantially the same general conditions shall be considered. General conditions is not defined. I'm sort of asking you to tell me, what do you think same general conditions mean? General conditions to me is not ambiguous. It's the same thing, the same situation, the same environment that's been created by the policyholder. It's like a batching clause in certain respects, but it relates to here the condition was the asbestos that was being put out as a product and sold and put in the market. It's the same general condition. That to me is what it refers to. And this is typical of language that is in many general liability policies, and it was in the ones that were located and it was included in the stipulation because it's part of a typical definition with respect to occurrence. I guess I'm mostly curious about why if this stipulation is so clear to you, nobody has been talking about this particular stipulation more because it seems to me that it favors your argument. But it's a stipulation of the same policy language that occurs in the policies that were located. Right. So it's nothing new. Right. It's the same definitional language with respect to the term occurrence, which we believe supports our argument here with respect to the one cause, one occurrence. It's language that elaborates on what can be deemed to be part of this singular cause. It's the general conditions there. I mean, maybe missing Your Honor's point as to its particular. I don't think it's more significant by virtue of the fact that it's in a stipulation. I wouldn't say that. It's the stipulation was intended to capture the totality of our description of an occurrence. Right. And so you had to fill in the blanks. Right. Right. Right. The question with regard to the amendment and the question of prejudice under Loyola, there's no surprise here. You can't argue surprise because everything you've said shows that there wasn't any surprise. The question is whether there was any prejudice. And there is, as UCC states, we should try to be liberal in their allowance of amendments in these situations. So where is the prejudice? I think the best case is to look at is the Geisler case for the point. But what it does is it effectively allows UCC to start over. It's the notion of starting over. Let's start over. There's no additional discovery that's needed, is there? There would be additional discovery. A little bit, maybe. With respect to the reservation of rights letters, what was received, what discussion was there following the reservation of rights letters, why they didn't confront us when they got the loss runs, what discussion did UCC have, why didn't they communicate that to travelers? There's all kinds of discovery that never took place with respect to that kind of discussion. I mean, that should take place so that that argument, which doesn't cause any surprise, why shouldn't that be allowed to proceed? The reasons I think Your Honor yourself was talking about when my opponent was standing here, which is that that would further a situation where you litigate, they strategically and tactically choose what theories they want in their complaint. And they chose for strategic and tactical purposes not to include a claim that was just estoppel waiver reliance related. They took it head on, we want to argue one occurrence or multiple occurrences. That's what they wanted to argue. When they lost that, that's when they said, oh, wait a minute, let's argue this alternative, different approach, which says, we're not going to argue about the merits, we're just going to argue a procedural issue of whether or not there was waiver and estoppel. That's a wholly different claim. That's about the relationship between the parties and all these other things. They chose not to put that type of thing in the record in the first go-around for their own reasons. But that doesn't mean they should be penalized necessarily for doing that if there's no surprise. Well, I think they should be penalized because if they had included that in their first complaint, that theory, those facts, those would have been the objects of discovery throughout the pendency of discovery in the case. They weren't. They weren't. There was some very cursory examination about the reservation of rights letters. Did you get them? Don't know if I did. I can't say I didn't. I mean, that was the nature of all the discovery really that related to these types of issues. And so now we should go back, start over, depose some of these same people and some additional people. I don't think that that's the way the trial court wanted to run his court, and I think he has the discretion, and it's a very, very high standard with respect to abuse of discretion to undermine the way he decided to structure this case. And maybe if this were a close call, if there was only one factor, prejudice, and I'm not conceding that factor, but if that was the only factor, I might find this to be a little bit more pointed an issue. But in fact, just the fact that they had everything they already needed to make this claim,  and we had invited them to amend by that footnote in our summary judgment. They chose not to. That was the consequence. And while the standard to amend at certain times in cases is liberal, the standard here for overturning this judge's manner of structuring his case, that's a very, very high standard, and I don't think those two standards should be mixed. Anything else? Thank you. Thank you, Your Honors. For 26 years, travelers remained silent. The last four or five years, we found them in discovery. Wait a second. Wait a second. You got a reservation of rights letters for 25 years in which they said, we reserve the right to enforce the applicable limits of liability. Now, if that's not an adequate reservation, I don't know what is. It's not an adequate reservation. What an adequate reservation would be, and this is a single occurrence. We reserve the right to assert that this is a single occurrence. I think the Royal Insurance Company case, and then look at Mogul and Phyllis, and you'll find that the reservation of rights has to be clear and specific. It can't be general or conditional or not specifically on point. And where I was going next was for the last four or five of those years, they were discussing us behind our backs, and they even drafted in 2005 a letter to tell us that this was their position, and then they decided not to use it. And we discovered that in discovery, and that plays prominently in our amended complaint. So I asked you, and you were going to tell me, where are the outraged letters from UCC to travelers saying, you changed your position, we rely on this? Outraged phone calls, Your Honor. Phone calls. I'm not testifying here. Royal didn't put it in writing? I'm saying business folks didn't put it in writing? In any event, I did want to answer your questions about there are no deductibles and there's no self-insured retention here. But for two years, we did not wait until we lost. Again, we raised these issues in the summary judgment motion. So it was not only not a surprise, but it was out there within two years, which is about the time frame of Loyola. And I go back to Loyola. These are not binary, by the way, dead on one, dead on all. Timing is a sliding scale. Opportunity is certainly a sliding scale. In Hoover, the post-summary judgment amendment was the third amendment that they offered. They could have raised it before. Two other times, the Supreme Court said it may not be the first possible moment, but it's a sufficiently early opportunity in the life of this lawsuit. Loyola, the lawyer went to court for several times over a period of months and said, I'm going to do this, I'm going to do this, didn't do it, and then finally did. And the Supreme Court said, close enough, because these are not binary on and off factors. These are judgment factors. And the biggest one is, can you state a claim? I haven't heard anybody say that the amended complaint does not state a proper claim for waiver. The argument is, oh, it's a different claim, it's a different claim. Well, it rests on much the same facts and many of the same issues and relationships, and it was at least hinted at, and I won't say more than that, in paragraph 14 of our original complaint. And so I don't believe it was. Hinted at? I don't want to overstate my case, Your Honor, but it specifically says that we understood travelers to have the same interpretation. It alleges that. We understood them to have the same interpretation. It does not use waiver. It does not use a stop law. I'm not trying to tell you that we plug that in there, but it at least addresses the underlying fact of it. What kind of prejudice? There's also prejudice. Why was there no prejudice in your opinion? Because before they had the answer in summary judgment, they were given an opportunity to take discovery. Mr. Jacobs, our corporate rep, was questioned about the reservation of rights letters. They were put into evidence. And that discovery was in response to the argument that travelers did not reserve at all. And then in your reply after the discovery, you said, oh, but it wasn't a sufficient reservation. So it seems to me a little bit like it's a moving target. Well, I don't know exactly how to say this. I mean, there were letters. There was no denial that there were the letters, but they did not specify the position that they ultimately took. They didn't reserve the position that they ultimately took. And so, you know, I'm going back to Royal on those cases. Is Royal the best case on that issue? Yeah. I mean, I would take the time to read Phylus and Mobile Royal too. I would beg your indulgence, Your Honor. You're, I'm sure, a quick reader. But, yes, you know, Royal is the one that at least addresses the situation where there is a letter and it talks about reserving certain rights. It doesn't hit the nail on the head and they say you've got to deal fairly with your insured and tell them what it is you reserve. And with respect to, just to answer the question, with respect to industrial manufacturing, and then I'll sit down. You know, it's not defined in the case law, but it is specifically used. And I think it hinges on this continuous concept that gypsum was cranking out asbestos products per se. They were selling these acoustic tiles. They were going into schools. We're putting together these massive systems that use a little bit of asbestos and I understand that people still got ill and it's not a question of, I'm not denying liability, but what I'm saying is that has an impact on what we were seeking insurance for, what we bought our insurance for, and what they agreed to insure. And when you talk about, in the interrogatory answer that they discussed, we listed the purpose of this and it was the sole purpose was to seal joints in our system. They asked us about promotional literature. There was no promotional literature. We weren't trying to sell this as a product. We were not manufacturing stuff. We were putting some of this and some of this in a box with a plastic lining and giving it to them and saying, when you assemble this, you've got to add water and stir. You know, this is not a big industrial manufacturing process, I submit to you. It's very different from what gypsum was doing. Thank you very much for your patience, Your Honor. Thank you, everybody, for your excellent briefs and supporting materials and great argument. The case is taken under advisement and we'll be right back with the next case.